NORTH CAROLINA

FRANKLIN COUNTY

FILED

2017 OCT 24 P 4: 22

FRANKLIN CO., C.S.C.

BY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS *878*

CLAIRE MURPHY, by and through MICHELLE
MULLEN, Attorney-in-Fact, on behalf of
herself and all others similarly situated,

        Plaintiff,

v.

SABER HEALTHCARE GROUP, LLC, SABER
HEALTHCARE HOLDINGS, LLC, FRANKLIN
OPERATIONS, LLC d/b/a FRANKLIN MANOR
ASSISTED LIVING CENTER, SMITHFIELD
EAST HEALTH HOLDINGS, LLC d/b/a
GABRIEL MANOR ASSISTED LIVING
CENTER, and QUEEN CITY AL
HOLDINGS, LLC d/b/a THE CROSSINGS
AT STEELE CREEK,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CLASS ACTION COMPLAINT**
**(Jury Trial Demanded)**

      Plaintiff CLAIRE M. MURPHY, by and through Michelle Mullen as Attorney-in-Fact

("Plaintiff"), by and through their undersigned counsel, on behalf of themselves and all other

persons and entities similarly situated, aver as follows:

## INTRODUCTION

      1.    Defendants SABER HEALTHCARE GROUP, LLC, SABER HEALTHCARE

HOLDINGS, LLC, FRANKLIN OPERATIONS, LLC, SMITHFIELD EAST HEALTH

HOLDINGS, LLC, and QUEEN CITY AL HOLDINGS, LLC (collectively, "Saber") own,

operate or manage three adult care homes in North Carolina: Franklin Manor Assisted Living

Center ("Franklin Manor"), Gabriel Manor Assisted Living Center ("Gabriel Manor"), and The

Crossings at Steele Creek ("Steele Creek") (collectively, the "North Carolina Care Centers").

2.     This class action arises out of Saber's failure to comply with its contractual and statutory obligations to provide assisted living services that meet the needs of the residents of the North Carolina Care Centers, including Plaintiff and the Class Members.

3.     The North Carolina Care Centers have failed and continue to fail to provide sufficient services to meet the basic needs of their residents ("Basic Services"). For example, The North Carolina Division of Health Services Regulation ("NC DHSR") has investigated and found residents left to sit for hours, even days, in their own waste, not bathed for weeks, locked in or out of their rooms, not provided with food or housekeeping services, and not timely provided with medications if they were provided their medications at all.

4.     The North Carolina Care Centers each have licensed Special Care Units for Alzheimer's and Related Disorders ("Special Care Unit"). Saber advertises, markets, and otherwise promotes each of the North Carolina Care Centers as having special care units for residents with Alzheimer's or related disorders. As such, the North Carolina Care Centers must maintain licensure and meet the rules and requirements of 10A N.C.A.C. 13F .1301 *et seq.*

5.     Among those requirements is sufficient staffing as mandated by 10A N.C.A.C. 13F .1308(a) ("Special Care Unit Staffing") which states:

> Staff shall be present in the unit at all times **in sufficient number to meet the needs of the residents**; but at no time shall there be less than one staff person, who meets the orientation and training requirements in Rule .1309 of this Section, for up to eight residents on first and second shifts and 1 hour of staff time for each additional resident; and one staff person for up to 10 residents on third shift and .8 hours of staff time for each additional resident. [Emphasis added].

6.     10A N.C.A.C. 13F .1308(a) establishes two independent criteria by which adequate staffing is evaluated: (1) the ratio of staff to residents in a given shift (the "Objective Threshold"); and (2) whether the needs of the residents are being met (the "Staffing Standard").

2

7.    A Special Care Unit that fails to staff the facility at the Objective Threshold, e.g. fewer than one (1) staff person per eight (8) residents on first or second shift, violates 10A N.C.A.C. 13F .1308(a) under any circumstances.

8.    However, a Special Care Unit that staffs its facility at the Objective Threshold still violates 10A N.C.A.C. 13F .1308(a) if it fails to meet the Staffing Standard, i.e. provide enough staff to meet the needs of the residents.

9.    In other words, the inquiry into whether a Special Care Unit has provided sufficient staffing under 10A N.C.A.C. 13F .1308(a) proceeds as follows:



10.    The North Carolina Care Centers have been investigated by NC DHSR and repeatedly found to be in violation of the 10A N.C.A.C. 13F .1308(a) staffing requirements.

3

11. As a consequence of this understaffing, each of Saber's North Carolina Care Centers were cited for numerous violations of the regulations set forth in 10A N.C.A.C. 13F .1301, *et seq.*, including, but not limited to, violations of the staffing requirements.

12. Because they did not have enough staff, Saber and the North Carolina Care Centers were unable to comply with their contractual obligation to provide Basic Services.

13. Upon information and belief, Saber's North Carolina Care Centers continue to fail to staff the North Carolina Centers in a sufficient number to meet the needs of their residents.

14. Saber's deliberate and intentional decision to understaff the North Carolina Care Centers was motivated entirely by its desire to increase profits at the expense of its residents with Alzheimer's and dementia.

15. Plaintiff and the Class Members bring this action to recover damages for breach of contract and violations of the North Carolina Unfair Trade Practices Act. Plaintiff and the Class Members also seek to enjoin Saber from continuing to understaff its North Carolina Care Centers pursuant to N.C. Gen. Stat. § 131D-28.

## JURISDICTION AND VENUE

16. The subject matter jurisdiction over this action and personal jurisdiction over the Defendants is conferred upon and vested in this Court under and by virtue of N.C. Gen. Stat.§§ 1-75.4, 7A-240, and 7A-243.

17. Venue for this action is properly laid in this Court pursuant to and in accordance with N.C. Gen. Stat.§§ 1-76, 1-77, 1-79, 1-80, and 1-82.

## THE PARTIES

4

18. Plaintiff CLAIRE M. MURPHY, by and through MICHELLE MULLEN, as the Durable Power of Attorney ("Murphy") is a citizen and resident of Franklin County, North Carolina. Mrs. Claire Murphy was a resident of Franklin Manor from April 7, 2015 through January 1, 2016. She then was a resident of Gabriel Manor from the end of January 2016 through April 19, 2016, at which point she moved back to Franklin Manor.

19. Defendant SABER HEALTHCARE HOLDINGS, LLC ("Saber Holdings") is an Ohio corporation that was at all times material hereto doing business in North Carolina as the owner, operator, manager, and/or exercising control over the adult care homes known as Franklin Manor Assisted Living Center, Gabriel Manor Assisted Living Center, and The Crossings at Steele Creek. At all times material hereto, Saber Holdings was engaged in business in North Carolina.

20. Defendant SABER HEALTHCARE GROUP, LLC ("Saber Group") is an Ohio corporation that was at all times material hereto doing business in North Carolina as the owner, operator, manager, and/or exercising control over the adult care homes known as Franklin Manor Assisted Living Center, Gabriel Manor Assisted Living Center, and the Crossings at Steele Creek. At all times material hereto, Saber Group was engaged in business in North Carolina.

21. Defendant FRANKLIN OPERATIONS, LLC ("Franklin Operations") is a Virginia Corporation with a principal place of business located in North Carolina. At all times material hereto Franklin Operations was doing business in North Carolina as the licensed owner and operator of Franklin Manor, located at 100 Sunset Dr., Youngsville, North Carolina. At all times material hereto, Franklin Operations was engaged in business in North Carolina.

22. Defendant SMITHFIELD EAST HEALTH HOLDINGS, LLC ("Smithfield") is a North Corporation. At all times material hereto Smithfield was doing business in North Carolina as the licensed owner and operator of Gabriel Manor, located at 84 Johnson Estate Road,

5

Clayton, North Carolina. At all times material hereto, Smithfield was engaged in business in North Carolina.

23.  Defendant QUEEN CITY AL HOLDINGS, LLC ("Queen City") is a North Carolina Corporation. At all times material hereto Queen City was doing business in North Carolina as the licensed owner and operator of Steele Creek, located at 13600 S. Tryon Street, Charlotte, NC. At all times material hereto, Queen City was engaged in business in North Carolina.

24.  On information and belief, at all times herein alleged, each Defendant was the agent, partner, joint venturer, representative, and/or employee of the remaining Defendants, and was acting within the course and scope of such agency, partnership, joint venture, and/or employment. Furthermore, in engaging in the conduct described below, the Defendants were all acting with the express or implied knowledge, consent, authorization, approval, and/or ratification of their co-defendants.

## COMMON FACTS

### I. Defendants Are Alter Egos of Each Other

25.  Defendants have created a complex ownership and management structure in order to shield themselves from liability and to carry out their single enterprise with financial impunity.

26.  There is sufficient unity of interest and ownership among Defendants, and between each of them, such that the acts of one are for the benefit and can be imputed to the acts of others.

27.  Saber owns and operates eighty-three (83) skilled nursing and assisted living facilities in six states including Pennsylvania, Ohio, Florida, Virginia, Indiana, and North Carolina.

6

28.    The corporate headquarters for the North Carolina Care Centers, Saber Group, and Saber Holdings are all located at the same address; 26691 Richmond Rd. Bedford Hts., OH 44146.

29.    The North Carolina Care Centers are undercapitalized.

30.    Saber Group owns the trademark "Saber Healthcare Group." Defendants use this mark and the branding that accompanies it for all eighty-three (83) skilled nursing and assisted living facilities throughout the country. The sign for each facility contains the mark and lists the facility as "A Saber Healthcare Group [facility]," as depicted here:



31.    Through its sharing of this mark, as well as other branding, the Defendants portray themselves to the public as a single enterprise. The email address for employees at the North Carolina Care Centers and Saber is [name]@saberhealth.com and the facilities do not maintain separate websites, but rather, have separate webpages within the http://www.saberhealth.com website. Saber portrays itself to the public that the North Carolina Care Centers are "Saber Healthcare Group [facilities]."

32.    Upon information and belief, Defendants also disregard corporate formalities and commingle funds.

33. Saber exercises complete dominion and control over the North Carolina Care Centers, performing the executive functions for each of the North Carolina Care Centers, including determining the budget and staffing level of each facility.

34. Saber exercises pervasive and continual control over the North Carolina Care Centers, such that they are mere agents or instrumentalities of what is often referred to in publications, directives, handbooks, manuals, contracts, advertising, and other publications as "Saber Healthcare Group."

## II. Staffing of the North Carolina Care Centers

35. All adult care homes licensed in North Carolina are subject to N.C. Gen. Stat. § 131D-2.1, *et seq*.

36. All adult care homes in North Carolina are also subject to the regulations contained in 10A N.C.A.C. 13F .0101, *et seq*.

37. All adult care homes that are licensed as a "Special Care Unit" for the provision of services to residents with Alzheimer's and Related Disorders are also subject to the regulations set forth in 10A N.C.A.C. 13F .1301, *et. seq.*

38. The North Carolina Care Centers each have a licensed "Special Care Unit" under N.C. Gen. Stat. § 131D-4.6 for the provision of adult home care services to residents with Alzheimer's and Related Disorders.

39. Accordingly, Saber and the North Carolina Care Centers are subject to and required to comply with N.C. Gen. Stat. § 131D-2.1, *et seq,*. 10A N.C.A.C. 13F.0101, *et seq*, and 10A N.C.A.C. 13F.1301, *et. seq.*

40. More specifically, the North Carolina Care Centers are required, *inter alia*, to comply with the Special Care Unit staffing requirements set forth in 10A N.C.A.C. 13F .1308.

8

41.     Saber consistently failed to and continues to fail to comply with the requirements set forth in 10A N.C.A.C. 13F.1301, *et. seq.*, including, but not limited to, 10A N.C.A.C. 13F .1308 (staffing requirements), 10A N.C.A.C. 13F.1004(g) (medication administration), and 10A N.C.A.C. 13F.0604(e)(2) (staff duties limitations).

42.     Additionally, Saber and the North Carolina Care Centers are required to comply with N.C. Gen. Stat. § 131D-2.15, which requires Defendants to perform an assessment of each resident within seventy-two (72) hours of admission and to: "...use the assessment to develop appropriate and comprehensive service plans and to develop the level and type of facility staff that is needed to meet the needs of the residents."

43.     In violation of N.C. Gen. Stat. § 131D-2.15, Defendants staff the North Carolina Centers based on the Objective Threshold requirement rather than the Staffing Standard based on the needs of the residents.

44.     Staffing to the Objective Threshold rather than the Staffing Standard increases profits for Defendants at the expense of the residents, whose basic needs cannot be and were not met.

## III.     The Residency Agreement

45.     Plaintiff and Class Members each entered into a written contract with Defendants called the Assisted Living Residency Agreement ("Residency Agreement"). A true and accurate copy of the Residency Agreement is attached hereto as **Exhibit A**.

46.     The Residency Agreement contemplates providing "Basic Services" in exchange for good and valuable consideration ranging from $4,100 to $5,000 per month depending on whether a resident elected a small companion suite, a large companion suite, or a private studio.

47.     The Residency Agreement defines "Basic Services" as the provision of: "...room, board, and such services as may be required for the . . . safety, good grooming, and well-being of

9

the Resident." These Basic Services were physical and manual services performed by unlicensed care aides, including, for example, assistance with walking, toileting, housekeeping, grooming, eating, delivering medications, and overall supervision to ensure that the residents remain safe.

48. The Residency Agreement also offers residents "Additional Services" for the provision of "…certain non-routine services and supplies in accordance with the orders of the Resident's attending physician and/or upon the Resident's request or consent." The Residency Agreement provides that the list of additional services is provided in the Fee Schedule, a true and accurate copy of which is attached hereto as **Exhibit B**.

49. Additional services include a $900 per month charge for residents who need physical assistance of two (2) people for care or assistance with dining, and an extra $300 per month for residents who require the administration of more than six (6) medications.

50. Thus, when Additional Services are purchased, Defendants are contractually obligated to:

     a. Maintain sufficient staff to enable two (2) staff members to assist residents with transfers, ambulation, toileting, eating, bathing and any other activity necessary to provide for the resident's well-being; and

     b. Maintain sufficient staff to provide more than six (6) medications to residents within one hour of the scheduled time.

51. In reality, Defendants do not expend any supplemental resources to provide additional services despite being paid to do so.

52. Defendants consistently staffed the North Carolina Care Centers in such a manner that they were unable to provide the services that were required for the safety, good grooming and well-being of the Plaintiff and Class Members.

**IV.**    **Saber's Policy and Routine Practice of Understaffing its Facilities**

10

53.     Saber's understaffing of the North Carolina Care Centers is business as usual for Saber. Since opening for business in North Carolina, Saber has had in place a company-wide policy of staffing to the Objective Threshold rather than the Staffing Standard of meeting the needs of the residents.

54.     By consistently underfunding the North Carolina Care Centers and mandating staffing levels below the state's requirements, Saber has violated several North Carolina Regulations, including, but not limited to, 10A N.C.A.C. 13F .1308 (setting forth minimum staffing requirements for special care units), N.C. Gen. Stat. § 131D-2.15 (mandating that residents be assessed within seventy-two hour of admission and requiring the facility to determine and implement the type and level of staffing necessary to meet the needs of the resident), 10A N.C.A.C. 13F.0604 (providing that aides shall not perform housekeeping and food service duties during the first and second shifts), and 10A N.C.A.C. 13F.1004 (providing that medications shall be administered within one hour before or after the prescribed or scheduled time).

55.     Due to understaffing, Saber has not provided the services required by North Carolina law for by Plaintiff and Class Members.

56.     Saber did not have adequate staff to handle housekeeping and food service. As a result, Personal Care Aides ("PCAs") and Medication Aides ("MAs") at the North Carolina Care Centers were subsequently diverted from providing personal care and assistance to the residents in order to take care of housekeeping and food service.

57.     North Carolina law prohibits aides like PCAs and MAs from being assigned food service duties. 10A N.C.A.C. 13F.0604(e)(2)(E) provides that in adult care homes with a capacity or census of 21 or more like the North Carolina Care Centers, "Aides shall not be assigned food service duties."

11

58.     As a result of understaffing, residents also have not been provided their medications within one hour before or one hour after the prescribed and/or scheduled time, in violation of 10A. N.C.A.C. 13F.0604.

59.     The North Carolina Care Centers have been cited on numerous occasions by NC DHSR for failing to meet the needs of the residents and for insufficient staffing.

60.     As reported by employees and former employees, Saber routinely understaffs the North Carolina Care Centers and other facilities it owns and operates. For instance:

a. "CNA's have up to 14 resident[s] on first shift, causing them to not be able to provide the care they need per resident resulting in them not bathing residents, pressure ulcers, no infection control, and numerous falls. This company only cares about money and not the needs of the residents and/or staff." (former employee at a Saber facility in North Carolina);

b. "Little concern for residents on behalf of corporate. Same can be said of staff, corp. does not care for its employees, only its profits." (former employee at a Saber facility in Ohio);

c. "The management has a policy of frugality that trumps the well-being of patients and employees, I truthfully have never witnessed a less professional work environment in a place designed to care for human beings." (former employee at a Saber facility in Ohio);

d. "This is absolutely the worst company I have ever worked for. They are constantly short staffed, unorganized and very poorly managed." (former employee at a Saber facility in Virginia);

e. "'Understaffed' is being kind. Facility was almost on a provisional license due to 21 deficiencies." (former employee at a Saber facility in Pennsylvania);

f. "Regional was only concerned about census not quality care." (former employee at a Saber facility in Virginia);

g. Cons of working at a Saber facility in North Carolina include, "inadequate staffing, training, orientation (non-existent) …" (former employee at a Saber facility in North Carolina);

h. "understaffed, overwhelmed with work with no help." (current employee at a Saber facility in Ohio);

12

i.  Cons of working at a Saber facility include, "Poor training, poor organization, poor staffing.";

j.  "[The dietary manager] even texted his employees that they needed to work without pay because corporate was on him to cut labor. ... If you like being lied to and working for a company that understaffs and randomly cuts hours then saber is the place for you." (current employee at a Saber facility in Indiana);

k.  "Saber Healthcare is definitely a big player, but I'm afraid the corporate team has lost focus on what's important ... the staff on the community level. ... Unfortunately, the ones who end up losing are the residents." (former employee at a Saber facility); and

l.  Cons of working at a Saber facility in Pennsylvania include, "[being] overworked and under paid, management does not care about employees, ... inexperienced nursing not fully trained." (current employee at a Saber facility in Pennsylvania).

## V.  **NC DHSR Investigations**

61.  In 2015 and 2016, each of the North Carolina Care Centers were inspected by the NC DHSR. Deficiencies and violations were noted at each facility, primarily as a result of understaffing.

62.  At multiple times in 2015, the NC DHSR cited Franklin Manor for violations of 10A N.C.A.C. 13F.0604, 10A N.C.A.C. 13F.0901(a), 10A N.C.A.C. 13F.0902(b), 10A N.C.A.C. 13F.0902(c)(3-4), 10A N.C.A.C. 13F.0904(d)(3)(A), 10A N.C.A.C. 13F.0909, 10A N.C.A.C. 13F.1004(a), 10A N.C.A.C. 13F.1004(j), 10A N.C.A.C. 1308(a), N.C. Gen. Stat. § 131D-21(2), and N.C. Gen. Stat. § 131D-21(4).

63.  Gabriel Manor was cited by the NC DHSR for similar deficiencies and violations multiple times in 2015.

64.  Steele Creek was cited for similar deficiencies and violations multiple times in 2014, 2015, and 2016.

65.   NC DHSR performed confidential interviews with four Franklin Manor staff members regarding their December of 2015 investigation, which revealed the following:

    a.   The facility did not employ dietary aids;

    b.   The PCAs and MAs were required to set up the dining room, serve the residents in the dining room, break down the tables after meals, and wipe down and sweep the dining room after each meal;

    c.   The first shift reported to work at 07:00 a.m. and the first thing they had to do was start getting residents served;

    d.   The MAs usually start their 08:00 a.m. medications between 8:30 and 09:00 a.m. due to serving the breakfast;

    e.   The medications that were due at 08:00 a.m. usually were finished between 10:30 a.m. and 10:45 a.m.;

    f.   The PCAs and MAs were required to launder and fold the cloth napkins after each meal;

    g.   The facility did not have a laundry person;

    h.   The night staff usually did the laundry at night, but during first or second shift if a resident soiled their clothing, they were responsible for laundering their clothes; and

    i.   The residents were not consistently bathed twice a week, as scheduled and required.

66.   NC DHSR also conducted confidential interviews of family members of Franklin Manor residents and made the following findings:

    a.   Family members came to the facility to assure the resident was receiving their shower, got their hair washed and teeth brushed after observing the facilities' failure to consistently do so;

    b.   During dining, there were residents seated at tables that needed assistance, but there were not enough staff to assist them with eating;

    c.   One resident who was new to the facility, would yell out during meals because she needed assistance with eating. After a while, a staff member would return her to her room where she would continue to yell out. This happened every day at lunch;

14

d. There had been a lot of falls in the facility; and

e. They had seen a lot of residents soil themselves because they were locked out of their rooms by Defendants.

67. NC DHSR also noted that residents were regularly locked out of their rooms as well as locked in their rooms.

68. NC DHSR also conducted an interview with the Franklin Manor Administrator and made the following findings:

a. The facility employs one cook and one dietary manager, but no dietary aids;

b. That the PCAs and MAs fill in as dietary aides;

c. That the PCAs and MAs set the tables in the dining room, serve the thirty-seven (37) residents in the dining room, bus the tables after the meal, and clean up the dining room after each meal;

d. That PCAs and MAs fold the scheduled and unscheduled laundry between resident care and medication administration at all times of the day;

e. That the housekeepers rarely did laundry because they were occupied with the general facility and resident room cleaning throughout the day;

f. That there were two (2) to three (3) PCAs and MAs that performed approximately 2 hours of dietary aide work for each meal;

g. That MAs process all the physician's orders and that the facility does not have a Resident Care Coordinator ("RCC") to assist with orders;

h. That there was no back up staff to ensure all residents reported to the dining room for each meal;

i. That the facility needs more staff; and

j. The administrator also acknowledged that MAs performing dietary aid duties, personal care duties and laundry duties: "may have caused their occasional delays in the [medication aides] med passes."

69. Medications scheduled to be administered at 08:00 a.m. not being administered until 12:00 p.m.

70. As noted *supra*, a failure to administer medication within one (1) hour of the scheduled time is a violation of 10A N.C.A.C. 13F .1004(g).

71. Residents who contracted for Basic Services and Med Level 2 medication administration have not been provided with the services they contracted for because there was not sufficient staff available to provide them.

72. Upon information and belief, in addition to failing to timely deliver medication, Defendants have also failed to properly monitor resident prescriptions to assure they have the necessary medications on hand to distribute pursuant to physician orders.

73. Another NC DHSR survey completed at The Crossings on July 27, 2015 noted consistent staffing levels of the Special Care Unit of one staff to twelve residents on the third shift in conjunction with some resident elopements on third shift.

74. Another NC DHSR survey was completed at Gabriel Manor on May 28, 2015. These findings were 149 pages and noted a plethora of deficiencies, including, but not limited to:

    a. Class A1 violations related to facility management;

    b. failing to assure the Special Care unit was clean, orderly and protected from contamination;

    c. failing to assure that medication were administered as ordered;

    d. failing to report allegation of abuse within 24 hours; and

    e. failing to assure minimum staffing levels.

**VI. The Impact of Saber's Understaffing Policy in the North Carolina Care Centers**

75. As a result of the Saber's understaffing policy at the North Carolina Care Centers, Plaintiff and the Class Members have not received housekeeping, grooming, toileting, and showering assistance as contemplated by the parties as part of the Basic Services.

16

76. For example, the NC DHSR survey completed at Franklin Manor on December 14, 2015 noted the following:

    a. Observation of the resident's room on December 8, 2015 revealed that the resident was in a reclined position. The resident was wearing a burgundy robe with food stains;

    b. The resident had not been showered;

    c. There was TED (Thromboembolism-deterrent) hose hanging on the bathroom towel bar rather than in use on the resident's legs;

    d. There were several Styrofoam breakfast dishes and cups in the resident's room on the chairside, table and dresser;

    e. There was a dry erase board on the wall behind the resident which read "write the times after every Depends (adult diaper) change every 2-3 hours" with no written times or dates;

    f. A follow-up visit by NC DHSR on December 9, 2015 revealed that the resident's incontinent brief was soiled with runny stool;

    g. The resident's thighs were red and excoriated;

    h. The resident was unable to stand up to get to her walker and asked the home health nurse for assistance to stand;

    i. The resident's robe was wet in the buttock area;

    j. The resident's brown-tinged nails had fecal matter underneath each of her 2-centimeter long nails on both hands;

    k. The resident's toenails were in need of being cut as evidenced by approximately 2 centimeters of overgrowth on each toe; and

    l. The resident was still not wearing TED hose as ordered.

77. Another NC DHSR survey completed at The Crossings on June 30, 2015 found a resident whose hair was oily and appeared "...grimy and in dirty clothing today." The survey further noted that the resident was wearing the "same clothing outfit from last visit by responsible party 3 weeks ago." After reviewing the bathing logs of the facility, it was

17

determined that this resident was not listed as being provided with a bath for the entire month of June, 2015.

## CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this class action pursuant to N.C. Gen. Stat. § 1A-1, Rule 23 on behalf of herself and Classes defined as follows:

<u>Injunctive Relief Class</u>:

**All residents of the Special Care Units at Franklin Manor Assisted Living Center, Gabriel Manor Assisted Living Center, and/or The Crossings at Steele Creek**

<u>Monetary Relief Class</u>:

**All persons who were private pay residents of the Special Care Units at Franklin Manor Assisted Living Center, Gabriel Manor Assisted Living Center, and/or The Crossings at Steele Creek from January 1, 2012 through the present.**

79.     Plaintiff reserves the right to redefine the Classes prior to class certification.

80.     Excluded from the Classes are: (a) any judge or magistrate presiding over this action and members of their families; (b) any Defendant and/or Third-Party Defendant and any entity in which any Defendant and/or Third-Party Defendant have a controlling interest or which has a controlling interest in any Defendant and/or Third-Party Defendant and its legal representatives, assigns and successors of any Defendant and/or Third-Party Defendant; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

81.     *Numerosity*: The Classes are composed of hundreds of residents of the North Carolina Care Centers who either reside or resided at those facilities since January 1, 2012. Franklin Manor is a Special Care Unit licensed by the State of North Carolina to have a maximum capacity of 54 residents at any given time. Gabriel Manor contains a Special Care Unit licensed by the State of North Carolina to have a maximum capacity of 48 residents at any one

18

given time. Steele Creek contains a Special Care Unit licensed by the State of North Carolina to have a maximum capacity of 48 residents at any one given time. The potential Class Members are composed of hundreds of persons geographically dispersed throughout the State of North Carolina and the country, the joinder of whom in one action is impractical. Moreover, upon information and belief, the Classes are readily ascertainable and identifiable from the Defendants' records.

82.     *Commonality*: Questions of law and fact common to the Classes exist as to all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual issues include the following:

a.      Whether Defendants' staffing was sufficient to meet the safety, good grooming, and well-being needs of the Plaintiff and Class Members;

b.      Whether Defendants intended to comply with the terms of the Resident Agreement at the time of contracting;

c.      Whether Defendants' business practice of staffing at a level that it knew or should have known was inadequate to meet the safety, good grooming, and well-being needs of the Plaintiff and Class Members;

d.      Whether Defendants' uniform understaffing policy prevented the provision of "Additional Services" contracted for and purchased by Plaintiff and the Class Members;

e.      Whether Defendants' conduct, acts, and/or omissions constitute a breach of contract with the Plaintiff and Class Members;

f.      Whether Defendants' conduct, acts, and/or omissions is a violation of the North Carolina Unfair Trade Practices Act;

g.      Whether Defendants violated and continue to violate resident's rights sufficient for injunctive relief as set forth in N.C. Gen. Stat. § 131D-19, *et seq*;

h.      Whether Plaintiff is entitled entitled to pre-judgment interest, costs, and attorneys' fees from Defendants; and

i.      Whether Plaintiff and the Class Members have sustained damages and, if so, the proper measure of such damages, including trebled damages.

19

83.    *Typicality*: Plaintiff's claims are typical of the claims of the members of the Classes, as all such claims arise out of Defendants' uniform course of wrongful conduct complained of herein.

84.    *Adequate Representation*: Plaintiff will fairly and adequately protect the interests of the Class Members and have no interests antagonistic to those of the Classes. Plaintiff have retained counsel experienced in the prosecution of complex litigation arising from skilled nursing and assisted living facilities in addition to extensive experience pursuing class actions.

85.    *Predominance and Superiority*: This class action is appropriate for certification because questions of law and fact common to the Class Members predominate over questions affecting only individual Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable. Should individual Class Members be required to bring separate actions, this Court and courts throughout North Carolina would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

86.    All conditions precedent to the prosecution of this action have been satisfied.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

87.    Plaintiff re-alleges and incorporates by reference the following preceding paragraphs of the Complaint as if fully set forth herein: 1-3, 10, 13-34, 45-52, 56, 60, 65-69, 71-82(b)(c)(e)(f)(h)(i), 83-86.

20

88.     At all times relevant hereto, there existed a valid and enforceable contract—Residency Agreement--between Plaintiff and Class Members and Defendants.

89.     Plaintiff and Class Members entered into contracts known as Residency Agreement(s) with Defendants for the provision of assisted living services.

90.     Plaintiff and Class Members paid good and valuable consideration for the provision of Basic Services and Additional Services under the Residency Agreement(s).

91.     Defendants contracted with Plaintiff and the Class Members to provide assisted living services that would meet the needs of the residents, including: "room, board, and such services as may be required for the . . . safety, good grooming and well-being of the resident[s]."

92.     Defendants failed to comply with their contractual obligations to provide services to meet the safety, good grooming and well-being needs of the Plaintiff and Class Members.

93.     Defendants' conduct constitutes a material breach of their contract(s) with Plaintiff and the Class Members.

94.     As a result of the foregoing breach of contract, Plaintiff and Class Members suffered actual damages as Plaintiff and Class Members did not receive the services that Defendants contractually agreed to provide.    Thus, Plaintiff and the Class Members have incurred damages in an amount in excess of $25,000, said amount to be proven at the trial of this action.

## SECOND CLAIM FOR RELIEF
### (North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1)

95.     Plaintiff re-allege and incorporate by reference the following preceding paragraphs of the Complaint as if fully set forth herein: 1-3, 10, 13-34, 45-52, 56, 60, 65-69, 71-72, 75-82(b-i), 83-93.

96.     N.C. Gen. Stat. § 75-1.1 makes unlawful, "unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce."

97.     Defendants are not members of a learned profession as Defendants are not medical professionals.

98.     The conduct in question does not relate to the rendering of professional services. Rather, the conduct in question relates to the failure to: (1) provide purely physical and manual services pursuant to the terms of the Residency Agreement; and (2) to determine the length of time needed to perform those physical and manual services.

99.     By operating the North Carolina Care Centers, the Defendants have affected commerce and trade within the state.

100.     Defendants did not provide services that they contractually agreed they would provide.

101.     Defendants engaged in unfair acts or practices by establishing a uniform business model of staffing the North Carolina Care Centers to the Objective Threshold rather than the Staffing Standard to meet the needs of the residents. Defendants knew or should have known that this conduct would result in its inability to provide Plaintiff and Class Members with the Basic Services that Defendants agreed to provide in the Residency Agreement. Defendants engaged in this conduct solely to maximize profits.

102.     Defendants knew or should have known—based on their intent to staff the Special Care Units with the minimum number under the Objective Threshold rather than the Staffing Standard—that they would not be able to comply with the terms of the Residency Agreements.

103.     Defendants never intended to comply with their obligations under the Residency Agreements at any time including when they entered into the Residency Agreements with Plaintiff and the Class Members.

22

104. Defendants' breach of contract with the Plaintiff and the Class Members is accompanied by numerous substantially aggravating factors:

   a. Defendants' conduct is offensive to established public policy of promoting the interests and well-being of the residents of adult care homes;

   b. Defendants never intended to fulfill their obligations under the contract including at the time of contracting;

   c. Defendants' breach of the Residency Agreements was malicious;

   d. Saber's corporate policy of understaffing their facilities was driven by greed to increase profit margins at the expense of the elderly and demented;

   e. This contractual dispute does not involve a disagreement between sophisticated businessmen;

   f. The elderly and demented are not in a position to speak up when their needs are not being provided for consistent with the Residency Agreements;

   g. Plaintiff and the Class Members were in an unequal bargaining position with Defendants;

   h. Defendants conduct is an inequitable assertion of one party's power or position.

   i. Defendants' conduct is substantially harmful to like consumers if allowed to continue unchecked; and

   j. In other ways to be shown at the trial of this action.

105. It is unfair for Defendants to enter contracts that Defendants knew they could not and would not perform based upon their unfair and illegal business model of inadequate staffing.

106. Defendants earned windfalls in the form of payments under the Resident Agreements for services they did not perform.

107. Defendants' conduct is immoral, unethical, oppressive, and unscrupulous.

23

108. Defendants' conduct was the direct and proximate cause of actual damages to Plaintiff in that she paid enormous amounts of money under the Residency Agreements for services they did not receive. Thus, Plaintiff and Class Members seek as actual damages the difference between the value of services Defendants agreed to provide in the Residency Agreement and the value of services Defendants actually provided.

109. Plaintiff and Class Members are not seeking any damages for personal or mental injury.

110. Defendants' unfair trade practices have directly and proximately caused Plaintiff's damages in an amount in excess of $25,000.00, said amount to be proven at the trial of this action.

111. By reason of the foregoing, Plaintiff is entitled to have her damages trebled and have the costs of this action, including reasonable attorney's fees, taxed against the Defendants pursuant to N.C. Gen. Stat.§ 75-16 and N.C. Gen. Stat. § 75-16.1.

### THIRD CLAIM FOR RELIEF
### (Injunctive Relief to Enforce Provisions of N.C. Gen. Stat. § 131D-19 *et seq.*)

112. Plaintiff re-alleges and incorporate by reference the preceding paragraphs of the Complaint as if fully set forth herein.

113. At all times relevant hereto, the North Carolina Care Centers were required to comply with the Adult Care Home Bill of Rights, N.C. Gen. Stat. § 131D-19, *et seq.*

114. Pursuant to N.C. Gen. Stat. § 131D-28, every resident has the right to institute a civil action for injunctive relief to enforce the provisions of N.C. Gen. Stat. § 131D-19, *et seq.*

115. Plaintiff and Class Members are residents as defined by N.C. Gen. Stat. § 131D-20.

24

116.    Defendants have violated provisions of N.C. Gen. Stat. § 131D-19, *et seq.*, including, but not limited to, N.C. Gen. Stat. § 131D-21 and N.C. Gen. Stat. § 131D-25.

117.    Defendants have also violated numerous regulations contained in 10A N.C.A.C. 13F.0101, *et seq.*, including, but not limited to, 10A N.C.A.C. 13F.0604, 10A N.C.A.C. 13F.0802, 10A N.C.A.C. 13F.1004, 10A N.C.A.C. 13F .1308, and N.C. Gen. Stat. § 131D-2.15.

118.    Violations of these regulations constitute violations of the residents' rights, including those of Plaintiff and the Class Members, enumerated in N.C. Gen. Stat. § 131D-21.

119.    Accordingly, Plaintiff and Class Members seek injunctive relief preventing Defendants from continuing to understaff the North Carolina Care Centers at levels below what is necessary to meet the needs of the Plaintiff and Class Members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, collectively and on behalf of all others similarly situated, pray for a judgment against Defendants as follows:

1.    For a declaration that the corporate form of Defendants be disregarded for purposes of allowing Plaintiff and Class Members to reach the assets of Defendants;

2.    For actual damages sustained by Plaintiff and the Class Members;

3.    For equitable and/or injunctive relief pursuant to N.C. Gen. Stat. § 131D-21;

4.    For payment of costs of suit herein incurred;

5.    For both pre-judgment and post-judgment interest on any amounts awarded;

6.    For payment of reasonable attorneys' fees and costs as may be allowable under applicable law, including, but not limited to, pursuant to N.C. Gen. Stat. § 75-16;

7.    For treble damages for its unfair trade practices as provided in N.C. Gen. Stat. § 75-16; and

8.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted, this the 24th day of October, 2017.

By:    /s/ Jeremy Williams
Stephen J. Gugenheim
N.C. State Bar No. 29776
Andrew D. Hathaway
N.C. State Bar No. 36801
**Gugenheim Law Offices, P.C.**
116 N. Person Street
Raleigh, North Carolina 27601
Telephone:  919-836-5551
Fax:  919-836-5550
Email: Steve@gugenheimlaw.com
Email: Drew@gugenheimlaw.com

Daniel K. Bryson
N.C. State Bar No. 15781
Matthew E. Lee
N.C. State Bar No. 35405
Jeremy R. Williams
N.C. State Bar No. 48162
**Whitfield, Bryson & Mason, LLP**
900 West Morgan St.
Raleigh, North Carolina 27603
Telephone: 919-600-5000
Email: Dan@wbmllp.com
Email: Matt@wbmllp.com
Email: Jeremy@wbmllp.com
**ATTORNEYS FOR PLAINTIFF**

26

*Review - will sign on day of move-in with Franklin Manor representative*

---

**Franklin Operations LLC DBA Franklin Manor Assisted Living Center**

### Assisted Living Residency Agreement

This Residency Agreement is made and entered into this day of _____, 20____, by and between    Franklin Operations LLC DBA Franklin Manor Assisted Living Center (the "Facility"), _____ ("Resident") and _____ ("Representative"). Hereinafter, when capitalized, the term "You" shall refer jointly and severally to the Resident and the Representative.

In consideration of the mutual promises and covenants contained in this Agreement, the parties hereby agree as follows:

#### I. SERVICES

A. **Basic Services.** The Facility agrees to provide room, board, and such services as may be required for the health, safety, good grooming, and well-being of the Resident. The Facility's current list of services included in the Basic Rate is located in the Fee Schedule.

B. **Additional Services.** In addition to the Basic Services, the Facility will provide certain additional non-routine services and supplies in accordance with the orders of the Resident's attending physician and/or upon the Resident's request or consent. The Facility's current list of these services is located in the Fee Schedule.

C. **Services of Other Providers.** The Resident may receive services from outside providers in the Facility so long as the outside provider is properly licensed and certified under the law, complies with all applicable government rules and the Facility policies. You must notify the Facility prior to engaging any outside person or entity to provide services to Resident at the Facility in order to discover what particular rules and policies may apply.

#### II. CHARGES & FEES

All charges, fines, or penalties that will be assessed against the Resident by the Facility are included in this Agreement.

A. **Basic Rate.** You shall pay in advance the Basic Rate of $_____ for all basic services and supplies provided by the Facility, such as room, board, laundry, meal service and housekeeping, as set forth in the Fee Schedule.

B. **Additional Services Rates.** You shall pay the rates set forth in the Fee Schedule for any additional services upon receipt of an invoice.

C. **Security Deposit.** You shall pay to the Facility an advance sum equal to $____Ø____, which is due upon signing of this Agreement. The security deposit shall be refunded within fourteen(14) days of termination of this Agreement, provided that all of the following conditions are satisfied: (1) You complied with the termination provisions of this Agreement; (2) Resident's unit is vacated and left in a clean and habitable condition that is available for rental upon surrender of the unit; and (3) the amount of the security deposit is sufficient to cover the cost of any debts owed to the Facility, including, but not limited to, any payments due to the Facility, if applicable, or for damages to Resident's unit or the common areas of the building attributable to Resident, ordinary wear and tear excepted; and if not, any security deposit will be applied to satisfy such debts or to repair any damages first before a refund, if any, is provided to You. Any deduction from the security deposit shall be itemized and identified by the Facility in a written notice delivered to You together with the amount of the security deposit due to You. Should damages attributable to Resident exceed the security deposit, You agree to reimburse the Facility for any additional expenses incurred upon receipt of an invoice.

D. **Third-Party Responsibility for Payment.**



1

1. <u>No Personal Liability of Representative</u>. All financial obligations in this Agreement are the Resident's, and nothing in this Agreement shall be construed to require that a Representative is in any way personally liable to pay for services rendered by the Facility to the Resident. Notwithstanding the foregoing, Representative may be liable for charges to the extent that he/she misappropriates, steals, or otherwise diverts a Resident's resources that are due to the Facility under this Agreement.

2. <u>Duty of Representative</u>. During the term of his/her residency, the Resident may need assistance in arranging for payment for the services provided. You have asserted to the Facility that the Representative shall act on the Resident's behalf to satisfy the Resident's financial obligations under this Agreement if the Resident chooses not to, or is unable to, meet those obligations.

3. <u>Limitation on Access to Resident's Resources</u>. You hereby certify that no one else has financial access or control over the Resident's income, resources and assets, and that You will not grant any other person or entity access or control over said income, resources or assets (with the exception of the Facility) during the term of this Agreement, unless such other person or entity first becomes a party to this Agreement.

4. <u>Diversion of Resident's Resources</u>. Representative agrees to be a good financial steward of the Resident's income, resources and assets over which he/she has control. Representative understands and agrees that the misappropriation, theft or redirection of those resources so that the Resident's financial obligations under this Agreement are not met is a violation of this Agreement, and may constitute a crime. If any payments or funds of the Resident that are available to pay for the Resident's care are withheld, misappropriated for personal use, or otherwise not turned over to the Facility for payment of the Resident's financial obligations under this Agreement, then Representative agrees to pay those amounts to the Facility from the Representative's own resources.

E. **Rate Changes.** The Basic Rate may be adjusted by the Facility at any time upon thirty (30) days advance written notice to the Resident. Current charges for additional services are available to You upon request.

F. **Services of Other Providers.** You agree to be responsible for charges incurred by outside providers, and not to hold the Facility liable in any way for the cost of those services.

G. **Late Charges and Cost of Collection.** Any charges not paid by You within thirty (30) days of its due date shall be subject to a late charge equal to one and half percent (1.5%) of the amount due per month, payable on demand, to cover the Facility's charges and expenses in connection with administering and collecting same, and such payment shall not constitute a waiver of the Facility's other rights and remedies under this Agreement. In the event that the Facility initiates any legal action or proceedings to collect payments due from You under this Agreement, You shall be responsible to pay all attorney's fees and costs incurred by the Facility in pursuing the enforcement of the Resident's financial obligations. If any check or payment from You is returned unpaid by the bank for insufficient funds or for any other reason, You agree to pay the Facility a service charge upon demand. You agree that said service charge is for the extra costs and expenses incurred with the collection, handling, and processing of such returned check.

H. **Refunds.** If, after all outstanding debts to the Facility have been paid, the Facility determines that You have overpaid for services, then the Facility will refund such overpayment in ninety (90) days.

I. **No Credits for Absence from Facility.** Credits or refunds are not made for temporary absences from the Resident's unit, e.g., when the Resident is in the hospital, a nursing facility or on vacation.

J. **Obligation to Keep the Facility Informed.** You understand that You are under a continuing obligation to keep the Facility informed of changes in the Resident's

2

financial status, and to immediately inform the Facility of such changes that may affect the Resident's ability to pay for the goods and services provided by the Facility. This obligation includes providing the Facility with an accurate financial statement in a form acceptable to the Facility upon request. You agree that if the Facility is not paid for goods and services rendered, then this Agreement may be terminated at the option of the Facility, and that the Facility reserves the right to take all appropriate legal action.

K. **Disputed Debts.** You are responsible for payment in full of all amounts due and owing to the Facility. If you disagree with a charge, you must notify the Administrator in writing of any dispute, and provide reasons and evidence of why you believe the charge is incorrect, within thirty (30) days after receipt of the first invoice that includes the disputed charge. If you do not submit such a written notification, then all charges shall be deemed accurate and any dispute will be deemed waived. All communications concerning disputed debts, including an instrument tendered as full satisfaction of a debt, are to be sent directly to the Administrator of the Facility in writing.

L. **No Legal or Equitable Interest.** You have no legal or equitable interest in the real or personal property of the Facility. The privileges under this Agreement are personal to the Resident and may not be assigned, sold or transferred by the Resident.

## III. TERMINATION

A. **General.** You may terminate this Agreement with fourteen (14) days written notice, subject to applicable State transfer and discharge provisions. The Agreement will otherwise remain in effect unless the Facility Terminates the Agreement as stipulated in this Section or until a different Agreement is executed.

B. **Transfer & Discharge.**

1. The Facility is required by law to discharge any resident who requires services or accommodations beyond that which it is licensed to provide, or that which it actually provides to residents.

2. Except for residents receiving hospice care or when a physician certifies that appropriate care can be provided on a temporary basis to meet the Resident's needs and prevent unnecessary relocation, the Facility is legally required to discharge any resident with any of the following conditions or care needs:

   a. Ventilator dependency;

   b. Individuals requiring continuous licensed nursing care;

   c. Individuals whose physician certifies that placement is no longer appropriate; or

   d. Individuals whose health needs cannot be met in the Facility as determined by the Facility.

3. All other discharges will be based on one of the following reasons:

   a. The discharge is necessary for the Resident's welfare and the Resident's needs cannot be met in the facility as documented by the Resident's physician, physician assistant or nurse practitioner;

   b. The Resident's health has improved sufficiently so the Resident no longer needs the services provided by the Facility as documented by the Resident's physician, physician assistant or nurse practitioner;

   c. The safety of other individuals in the facility is endangered;

   d. The health of other individuals in the facility is endangered as documented by a physician, physician assistant or nurse practitioner; or

   e. You fail to pay the costs of services and accommodations by the payment due date after receiving written notice of warning of discharge for failure to pay.

3. Medicaid Program. the Facility is a participant in the medical assistance program administered by the North Carolina Division of Medical Assistance; Personal care service in assisted living facilities may

3

be covered by North Carolina Medicaid. Information regarding this program can be obtained from North Carolina State Medicaid office.

C. **Death.** In the event of the death of the Resident, this Agreement will continue until the last day of the month in which all amounts due to the Facility are paid in full. If the term "Resident" is used in this Agreement to refer to two (2) people, then, following the death of one of the residents, the Agreement shall continue according to the same terms and conditions with respect to the surviving resident.

D. **Effect of Termination and Holdover.** After the Agreement is terminated, You agree that You will ensure that the Resident moves out of the Facility. This includes moving out of the Facility by the date specified in the discharge notice in the event of an involuntary discharge. If the Resident does not move out of the Facility by the termination date, then You agree that the Resident shall pay the Facility a per diem rate equal to two times the Facility's then-current rate for the occupied unit for all days that the Resident remains in the Facility after termination of the Agreement. You agree to pay all of the Facility's expenses, including attorney's fees and court costs, for any legal action commenced by the Facility to enforce the discharge or otherwise remove the Resident from the Facility.

E. **Removal of Belongings.** You shall have seven (7) days after termination of this Residency Agreement to remove the Resident's belongings from the Facility. After that time any property remaining unclaimed will be deemed abandoned, and the Facility reserves the right to dispose of that property at its sole discretion.

F. **Payment of Accrued Charges.** All accrued charges must be paid in full upon invoice after termination of the Agreement.

## IV. MISCELLANEOUS

A. **Notifications; Exercising Rights for Resident.** By signing this Agreement, the Representative is certifying that he/she: (1) has an interest or responsibility in the Resident's welfare; and (2) has been identified to the Facility as the person responsible for exercising the rights of the Resident if and when he/she is mentally and/or physically incapable of exercising such rights on his or her own behalf. The Resident and Representative have identified the Representative as the person to be notified whenever such notifications are necessary as required by law or in the judgment of the Facility.

B. **Nondiscrimination.** The Facility offers its services to persons whose needs can be met by the Facility, without regard to race, creed, sex, age, national origin, handicap, or disability.

C. **Waiver.** The failure of the Facility in any one or more instances, to insist upon strict compliance by You with, or its waiver of any breach of, any of the terms or provisions of this Agreement, shall not be construed to be a waiver by the Facility of its rights to insist upon strict compliance by You with all of the terms and provisions of this Agreement.

D. **Partial Illegality.** This Agreement shall be construed in accordance with the laws of the State of North Carolina, and the county in which the Facility is located shall be the sole and exclusive venue for any dispute between the parties, including, but not limited to, litigation, special proceeding, or other proceeding between the parties that may be brought, arise out of or in connection with or by reason of this Agreement. If any portion of this Agreement is determined to be illegal or not in conformity with applicable laws and regulations, such part shall be deemed to be modified so as to be in accordance with such laws and regulations, and the validity of the balance of this Agreement shall not be affected.

E. **Amendments.** The Facility is not liable for, nor bound in any manner by, any statements, representations or promises made by any person representing or purporting to represent the Facility, unless such statements, representations or promises are set forth in writing and incorporated into this Agreement. Modification of this Agreement may be made

4

only by agreement of both/all the parties in writing; provided, however, the Facility reserves the right to amend the Agreement at any time in order to conform to changes in laws, and to amend policies, procedures, etc. as otherwise noted in this Agreement. The Facility will provide You with at least thirty (30) days notice prior to making any changes to this Agreement to conform to changes in the law.

F.  **Representation of Accuracy.** You represent that the information contained on the application forms, financial statements and health history provided to the Facility are true to the best of your knowledge and belief. You understand that the Facility has relied upon such information and agree that if any of the facts were misrepresented or any important information was left out, then the Facility may be forced to terminate the Agreement.

G.  **Incorporation of Other Documents.** The following documents are hereby incorporated into this Agreement by reference: Fee Schedule, all application forms, financial statements, and medical records provided to the Facility as part of the Resident's application for admission to the Facility; and all documents that the Resident signed or received during the admission process to the Facility.

THE PARTIES AGREE THAT THERE ARE NO ACTUAL OR INTENDED THIRD PARTY BENEFICIARIES OF THIS AGREEMENT OTHER THAN THOSE PERSONS OR ENTITIES WHOSE NAMES ARE SIGNED BELOW. THEY HAVE READ ALL OF THE TERMS OF THIS AGREEMENT, AND THEY HAVE HAD AN OPPORTUNITY TO ASK QUESTIONS REGARDING THOSE TERMS.

I GIVE PERMISSION TO MY REPRESENTATIVE TO SIGN ANY AND ALL DOCUMENTS THAT ARE PART OF THE ADMISSION PROCESS TO THE FACILITY ON MY BEHALF AS MY AGENT. I AGREE THAT IN SIGNING ON MY BEHALF, MY REPRESENTATIVE BINDS ME TO ALL DUTIES IMPOSED BY SUCH DOCUMENTS AS IF I HAD SIGNED THEM MYSELF, INCLUDING THE DUTY TO PAY THE FACILITY FOR SERVICES RENDERED.

I UNDERSTAND AND AGREE THAT THE SERVICES PROVIDED BY THE FACILITY DO NOT INCLUDE CONTINUOUS ONE-ON-ONE MONITORING OF THE RESIDENT, AND THAT MY EXPECTATIONS WILL BE CONSISTENT WITH THIS UNDERSTANDING. I AGREE THAT THE FACILITY IS NOT AN INSURER OF THE RESIDENT'S WELFARE AND SAFETY, AND THAT THE RESIDENT WILL EXERCISE DUE CARE TO PROTECT HIMSELF/HERSELF FROM HARM.

THE PARTIES DO FOR THEMSELVES, THEIR HEIRS, ADMINISTRATORS AND EXECUTORS, AGREE TO THE TERMS OF THIS AGREEMENT IN CONSIDERATION OF THE FACILITY'S ACCEPTANCE OF AND RENDERING SERVICES TO THE RESIDENT.

IN WITNESS WHEREOF, the parties, intending to be legally bound, have signed this Agreement as of the date first above written.

**RESIDENT**                                           **REPRESENTATIVE**

_____          _____
*Signature*                                                      *Signature*

_____          _____
*Print Name*                                                    *Print Name*
The Facility

_____
*Signature*

_____
*Print Name*

_____
*Title*

5



# Franklin Manor

Specializing in Dementia and Memory Care

## Fee Schedule

| Suite: | Monthly Rate: |
|--------|---------------|
| Small Companion......$4,100 | |
| Large Companion......$4,400 | |
| Private Studio.........$5,000 | |

### What does the price include:

- Three meals and snacks per day
- Daily housekeeping services
- Laundry service twice a week
- Utilities included (phone, cable, electricity, water)
- Local transportation
- Emergency response system
- Secure neighborhood
- Shower assistance twice per week
- Physical assistance of one person for dressing, grooming, assistance to bathroom, showering (Care Level 1)
- Medication administration cost of 6 or fewer medications

### Care Levels:

- Care Level 1 – included in base rate
- Care Level 2 - $900 per month—physically assistance of 2 people for care or assistance with dining

### Medication Management:

- Med Level 1 – included in base rate
- Med Level 2 - $300 per month

### Respite Options:

- We offer short-term stays, including all of the standard services and amenities
  Additional...............$25 per day

### Move In Fee................$2,000

- A one-time, non-refundable move in fee is required prior to move in. The move in fee is for the maintenance and upkeep of your suite and the common areas of the community.



EXHIBIT
B
tabber

Questions or concerns? Call Emily Abbott, Community Relations Liaison at 919.482.5947

 **Franklin Manor**

## Fee Schedule

Room Trays....................Additional $5.00 (Exception if the resident is sick/ill)

Guest meals...................Breakfast: $3.00

                                  Lunch:     $5.00

                                  Dinner:   $7.00

                                  Buffet:   $7.00

Laundry........................Additional load per week: $25.00/ $100.00 monthly

Carpet cleaning...............Additional $100 (if needs commercial cleaning)

Housekeeping..................Additional day per week: $25.00/ $100.00 monthly

Pet deposit..................... Additional $150.00 (non- refundable)

Incontinent supplies.........Individual costs based on need per resident

*These will be charged to your monthly statement if using the community services/ supplies. 10% delivery fee charged.

Transportation................Additional visit $25 round trip

* Reminder: Transportation for physician visits will be scheduled Tuesday and Thursday.