IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-cv-317-BO

MICHELE MULLEN, Executrix of )
the ESTATE OF CLAIRE M. MURPHY, )
on behalf of herself and all others )
similarly situated, )
)
    Plaintiff, )
)
v. )    O R D E R
)
SABER HEALTHCARE GROUP, LLC, )
and FRANKLIN OPERATIONS, LLC )
d/b/a Franklin Manor Assisted Living )
Center, )
)
    Defendants. )

This cause comes before the Court on defendants' renewed motion to compel arbitration, for judgment on the pleadings, and to dismiss. Plaintiff has responded in opposition and the motion is ripe for disposition. For the reasons that follow, the motion is granted in part and denied in part.

BACKGROUND

This putative class action challenges the staffing levels and provision of services at certain assisted living facilities in North Carolina affiliated with Saber Healthcare Group, LLC ("SHG"). The case specifically concerns SHG locations that have licensed "Special Care Units" for residents suffering from Alzheimer's disease and related disorders. Between April 2015 and October 2016, decedent Claire Murphy resided at two of these facilities: Franklin Operations, LLC (d/b/a Franklin Manor Assisted Living Center) and Smithfield East Health Holdings, LLC (d/b/a Gabriel Manor Assisted Living Center). There is a third facility in North Carolina affiliated with SHG that

has a Special Care Unit—Queen City AL Holdings, LLC (d/b/a The Crossings at Steele Creek). Ms. Murphy never resided at this facility.

Plaintiff Michele Mullen (hereinafter "plaintiff"), acting as attorney-in-fact for Ms. Murphy, originally brought claims in Franklin County Superior Court in April 2016 alongside several other plaintiffs in a different action. That case, *Bartels et al. v. Saber Healthcare Group, LLC et al.*, 5:16-cv-283, was removed to this Court and proceedings remain ongoing. In October 2016, however, plaintiff voluntarily dismissed her claims in *Bartels* and initiated this action in Franklin County in October 2017. Plaintiff named five defendants affiliated with SHG, including all three residential facilities: (1) Saber Healthcare Group, LLC; (2) Saber Healthcare Holdings, LLC; (3) Franklin Operations, LLC ("Franklin Manor"); (4) Smithfield East Health Holdings, LLC ("Gabriel Manor"); and (5) Queen City AL Holdings, LLC ("Steele Creek"). The complaint sought to assemble a class consisting of all residents at Franklin Manor, Gabriel Manor, and Steele Creek based on defendants' failure to comply with contractual and statutory obligations to provide adequate assisted living services.

Defendants removed to this Court on June 28, 2018 under the Class Action Fairness Act. Following Ms. Murphy's death, plaintiff was substituted as Executrix of the Estate of Claire M. Murphy. Plaintiff moved to remand to Franklin County based on forum-selection clauses contained in defendants' residency agreements with Ms. Murphy. Defendants moved to dismiss. Plaintiff then followed with an amended complaint, which remains the operative pleading. The amended complaint names only two defendants: Saber Healthcare Group, LLC and Franklin Operations, LLC. It brings two claims for relief: breach of contract and violation of North Carolina's Unfair and Deceptive Trade Practice Act ("UDTPA"). Defendants moved to dismiss under Rules 12(b)(1)

and 12(b)(3) based on arbitration agreements purporting to cover claims arising from Ms. Murphy's time at Franklin Manor.

The issue governing the outcome of plaintiff's remand motion was whether both defendants—SHG and Franklin—were bound to the forum-selection clauses, which were facially between only plaintiff and Franklin. The nature of the relationship between SHG and the three assisted living facilities has been the source of extensive litigation in both this case and *Bartels*. To summarize briefly, the plaintiffs in both cases contend that SHG operates and manages the three facilities in every substantive way. They argue that the three facility-LLCs are mere shell companies and that the entire Saber operation is properly viewed as a joint enterprise with the entities as alter egos. Defendants, on the other hand, reject the various veil-piercing allegations offered by the plaintiffs and maintain that SHG merely provides services to the three facility-LLCs through a "consulting agreement." As a matter of corporate form, SHG and the three facility-LLCs are sister companies owned by Saber Holdings, LLC.

Consistent with the Court's conclusion in *Bartels*, on December 4, 2018, the Court granted plaintiff's motion to remand. The Court determined that SHG and Franklin are alter egos of each other, and therefore, both bound to the forum-selection clauses. The Court explicitly took no action on defendants' two motions to dismiss, instead preserving them for the state court. Defendants appealed the Court's order, which was vacated on March 4, 2020 in light of the court of appeals' decision in *Pfohl v. Saber Healthcare Group, LLC*, 784 F. App'x 137 (4th Cir. Aug. 12, 2019). Because the motions to dismiss were no longer pending on the docket, the Court directed defendants to refile the motions. Accordingly, on June 26, 2020, defendants filed a renewed motion to dismiss. This motion is currently before the Court.

3

In the renewed motion, defendants make the following main contentions: (1) all of plaintiff's claims arising from Ms. Murphy's residency at Franklin Manor are subject to arbitration; (2) plaintiff's remaining breach of contract and UDTPA counts fail to state claims upon which relief can be granted; and (3) plaintiff lacks standing to bring claims based on the Steele Creek residency agreement. Plaintiff opposes the motion, which is ripe for disposition.

## DISCUSSION

I.  Arbitration of Claims Related to Franklin Manor Stays

The Federal Arbitration Act ("FAA") "reflects a liberal federal policy favoring arbitration agreements." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (quotations omitted). A district court must stay proceedings and compel arbitration if the moving party demonstrates: (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect, or refusal of the nonmovant to arbitrate the dispute. *Id.* at 500–01. In determining whether the parties agreed to arbitrate, courts apply state law principles governing contract formation. *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 85 (4th Cir. 2016).

Claire Murphy was a resident at Franklin Manor on two occasions, the first commencing on April 7, 2015 and the second on April 21, 2016. In connection with both stays at Franklin Manor, Ms. Mullen, as Ms. Murphy's power of attorney, executed documents titled "Resident and Facility Arbitration Agreement." DE 41-4, DE 41-7. These documents provide, in relevant part, that any legal dispute between the parties shall be settled by binding arbitration. *Id.* Consequently, at first pass, the four elements detailed above are clearly met.

4

Plaintiff, however, makes two arguments challenging the validity of these two arbitration agreements. First, she argues that as a matter of North Carolina law, she was without authority to waive Ms. Murphy's right to a jury trial by executing the arbitration agreements. Second, plaintiff argues that, to the extent she had such authority, she properly revoked the 2016 arbitration agreement within sixty days—as provided for in the agreement itself—by filing an amended complaint in the *Bartels* action. The Court addresses each of these in turn.

A. *Plaintiff had the authority to sign the arbitration agreements.*

In 2009, power of attorney ("POA") and healthcare power of attorney ("HCPOA") documents were executed empowering plaintiff to act as an agent for Ms. Murphy. The statutory short-form POA gave plaintiff full authority to act on behalf of Ms. Murphy with respect to certain enumerated matters, as those matters were defined in Chapter 32A[1] of the North Carolina General Statutes. The POA gave plaintiff authority over real estate, personal property, securities, banking, estate matters, insurance, personal relationships, taxes, and gifts. DE 69-2. Additionally, the HCPOA gave plaintiff power over health care decisions, including the authority to "sign, execute, deliver, and acknowledge any contract or other document that may be necessary, desirable, convenient, or proper to exercise and carry out any of the powers described in [the HCPOA]." *Id.*

Plaintiff does not argue these POA documents were invalid, only that they did not grant her any power to sign the arbitration agreements and thereby waive Ms. Murphy's right to trial by jury. Plaintiff argues "[t]here is no language in any of the powers defined by G.S. 32A-2 that states,

---

[1] In 2017, North Carolina repealed N.C.G.S. 32A and enacted N.C.G.S. 32C, North Carolina Uniform Power of Attorney Act. The new G.S. 32C took effect January 1, 2018. Pursuant to N.C.G.S. 32C-4-403(d), "the power conferred by former G.S. 32A2 shall apply to a Statutory Short Form Power of Attorney that was created in accordance with former G.S. 32A-1 prior to January 1, 2018." The POA executed by Claire Murphy was a Statutory Short Form Power of Attorney executed in 2009. Thus, the powers conferred to Michele Mullen as defined under the old G.S. 32A-2 apply to the interpretation of the Claire Murphy POA.

5

explicitly or implicitly, that any of the powers listed in the short-form POA includes the power to waive constitutional rights." Pl.'s Resp. at 9.

Plaintiff's reading of the POA and HCPOA ignores two explicit grants of authority that are fairly read to encompass the power to sign an arbitration agreement with an assisted living facility. First, the POA granted plaintiff power over Ms. Murphy's "Personal Relationships and Affairs," as that category is defined in G.S. 32A-2(9). That definition included the power "to provide medical, dental and surgical care, hospitalization and *custodial care* for the principal." N.C.G.S. 32A-2(9) (emphasis added). And the HCPOA states that plaintiff had the power "to consent to and authorize [] admission to and discharge from a hospital, nursing or convalescent home, or other institution . . . ." DE 69-2. The HCPOA contains another clause providing that plaintiff had the power "to take any lawful actions that may be necessary to carry out [the powers enumerated in the HCPOA], including the granting of releases of liability to medical providers." *Id.*

Arbitration clauses are common terms in modern contracts. A specific grant of authority in a POA or HCPOA necessarily implies the authority to sign contracts with arbitration agreements to carry out that authority. Indeed, an alternative reading that does not imply the ability to sign arbitration agreements would frustrate the agent's ability to perform his or her obligations under the POA. The ability of plaintiff to provide custodial care for Ms. Murphy and to secure her admission to a nursing home necessarily implies the authority to sign arbitration agreements with assisted living facilities.

The Court's reading of the POA and HCPOA accords with the decisions of other courts in North Carolina. In *Raper v. Oliver House, LLC*, the North Carolina Court of Appeals overturned a trial court decision holding that an assisted living facility's form arbitration agreement, signed by an executrix, was unconscionable and void as against North Carolina public policy. 180 N.C.

6

App. 414, 423 (2006). At least one other federal court in the state has enforced an arbitration clause in the face of an argument from the plaintiff that an agent operating under authority of a living will and a general power of attorney did not have the authority to waive the decedent's constitutional right to a jury trial. *Bergman v. SSC Monroe Operating Co. LLC*, No. 3:11-CV-494, 2011 WL 6296653, at *2 (W.D.N.C. Dec. 16, 2011). And courts have routinely enforced arbitration clauses signed by agents operating under power of attorney documents without regard for the waiver issue. *See SSC Statesville Maple Leaf Operating Co., LLC v. Morgan*, No. 5:11CV184-RLV-DSC, 2012 WL 3112405, at *3 (W.D.N.C. July 31, 2012); *Westmoreland v. High Point Healthcare Inc.*, 218 N.C. App. 76, 79–91 (2012).

The sum and substance of plaintiff's argument is that POAs must explicitly enumerate the power to sign arbitration agreements. But this approach was rejected by the Supreme Court in *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421 (2017). Plaintiff also misreads *Kindred Nursing Centers Ltd. P'ship v. Wellner*, 533 S.W.3d 189 (Ky. 2017). On remand from the Supreme Court after *Clark*, the Kentucky court explained that the POA granted the agent the power to make arbitration agreements, but only when the agent was pursuing powers explicitly enumerated in the POA. *Wellner*, 533 S.W.3d at 193–94. The arbitration agreement in *Wellner* ultimately failed because it was not executed in pursuit of any of the powers enumerated in the POA. *Id.* Here, both the POA and the HCPOA explicitly granted plaintiff the power to provide assisted living services for Ms. Murphy, and this implied the authority to sign arbitration agreements in pursuit of that end.

### B. *Plaintiff did not revoke the 2016 arbitration agreement.*

The arbitration agreements in this case gave residents the right to cancel within 60 days by notifying the facility in writing, delivered via certified mail. Plaintiff argues she implicitly revoked

7

the 2016 arbitration agreement—signed on April 19, 2016—through the amended complaint that was filed in the *Bartels* action on May 9, 2016.

The Court disagrees. The arbitration agreement specifies the manner through which cancellation could occur. Plaintiff did not follow those procedures, and therefore, did not exercise her right under the contract. Plaintiff's citation to *Winrow v. Discovery Ins. Co.*, 189 N.C. App. 212, (2008) is inapposite because the rule from *Dickinson v. Dodds*, 2 Ch. Div. 463 (1876) is about offer revocation, not exercising a contractual right. Moreover, even if the 2016 agreement was properly cancelled, plaintiff would still be bound to the 2015 agreement.

  *C. The arbitration agreements do not provide for class arbitration.*

The next issue for the Court related to arbitration is whether the agreements permit class arbitration. "[W]hether an arbitration clause permits class arbitration is a gateway question of arbitrability for the court." *Del Webb Communities, Inc. v. Carlson*, 817 F.3d 867, 873 (4th Cir. 2016). A party cannot be required to submit to class arbitration unless the parties agreed to class arbitration. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). Although *Stolt-Nielson* did not address what contractual basis would support a finding that the parties agreed to authorize class arbitration, *id.* at 687 n.10, the Court did explain that class arbitration may not be implied solely from the existence of the agreement to arbitrate. *Id.* at 685. Here, the arbitration agreements are silent on the issue of class arbitration. However, on the issue of procedures governing arbitration, the agreements state that the "arbitration shall be conducted in accordance with the NAM Code of Procedure, which is hereby incorporated in this Agreement by reference." DE 41-4; DE 41-7. Rule 26(c) of the NAM procedures states:

> "It is NAM's policy to administer class action Arbitrations if the underlying Arbitration agreement allows for the submission of class actions to Arbitration. If the Arbitration agreement is silent with respect to class actions, consolidation or

8

> joinder of claims, NAM will not administer the case as such, unless the parties agree to same and authorize NAM, in writing, to do so.

DE 69-3 at 18. Again, the arbitration agreements say nothing about authorizing class arbitration, and the NAM rules that are incorporated by reference clearly allow class arbitration only when the face of the agreement speaks to it. Consequently, the Court finds that the parties did not agree to class arbitration, and thus, plaintiff must pursue arbitration individually.

### D. *Plaintiff is bound to arbitrate with both defendants.*

The final question for the Court with respect to arbitration is whether plaintiff is bound to arbitrate her Franklin Manor claims against both defendants. The arbitration agreements were executed by Ms. Mullen and Franklin Manor. SHG is not a signatory to either agreement. Nevertheless, defendants argue that plaintiff should be compelled to arbitrate her claims against both Franklin and SHG.

The irony of defendants' position, of course, is that in their opposition to plaintiff's motion to remand, they fought tooth and nail to create distance between SHG and Franklin in order to avoid the forum-selection clauses in the residency agreements. This notwithstanding, the arbitration agreements cover SHG because SHG is an affiliate of Franklin Operations, LLC and is a third-party beneficiary under the agreements. Section A of both arbitration agreements states that the agreements cover claims against Franklin as well as its "employees, agents, officers, directors, any parent, subsidiary or affiliate of the facility." DE 41-4, DE 41-7. Both SHG and Franklin are owned by Saber Holdings, LLC. SHG and Franklin are, at the very least, sister companies and are properly considered affiliates. *Procar II, Inc. v. Dennis*, 218 N.C. App. 600, 601 (2012) (adopting Black's Law Dictionary's definition of "affiliate," which includes common ownership).

To summarize, the Court concludes (1) plaintiff had authority to sign the arbitration agreements, (2) the agreements were not revoked or cancelled, (3) the parties did not agree to class

9

arbitration, and (4) plaintiff must arbitrate her claims against both defendants. These conclusions govern only claims arising from Ms. Murphy's two stays at Franklin Manor; no arbitration agreement was executed as part of her stay at Gabriel Manor and defendants have not moved to compel arbitration on these claims.

II.  Remaining Claims

Plaintiff named two defendants in the amended complaint: SHG and Franklin Operations. Against each defendant, plaintiff brought two claims: breach of contract and UDTPA. The Court has concluded that plaintiff's claims arising from her stay at Franklin Manor are properly the subject of arbitration. The bulk of defendants' remaining motion is dedicated to dismissing what they refer to generally as plaintiff's "remaining claims." The only claims remaining in the case are plaintiff's breach of contract and UDTPA claims against SHG arising from Ms. Murphy's stay at Gabriel Manor.

Defendants move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Court reviews a Rule 12(c) motion under the same standard as Rule 12(b)(6). To survive the motion, the complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255–56 (4th Cir. 2009) (quotations and citation omitted).

   *A. Plaintiff has stated a plausible breach of contract claim.*

Defendants move to dismiss plaintiff's breach of contract claim because, they argue, it rests only on a promise to comply with a pre-existing obligation imposed by law and the documents incorporated into the residency agreement disclosed the very conduct plaintiff has alleged to be a breach. These arguments are unavailing.

10

Of course, a promise to perform a pre-existing duty, such as one imposed by law, does not constitute consideration to support a contract. *Burton v. Williams*, 202 N.C. App. 81, 85 (2010). But the issue of valid consideration goes to contract formation, and there is no dispute that the parties have a valid contract. The residency agreements contain extensive detail about the parties' respective obligations. Ms. Murphy, through plaintiff, paid thousands of dollars each month in exchange for the ability to reside at Gabriel Manor. A party's compliance with regulations can constitute a term of an otherwise valid contract. *Sanders v. State Pers. Comm'n*, 197 N.C. App. 314, 321–22 (2009). The contracts are clearly valid, and defendants contractually committed themselves to maintaining certain levels of staffing.

Moreover, plaintiff's breach of contract claim does not rest solely on the failure to comply with North Carolina regulations. The complaint also alleges a failure to make good on the contractual promise to provide services "required for the health, safety, good grooming, and well-being of the resident" and more specifically, to provide the services enumerated in the incorporated Fee Schedule. DE 57-1; DE 57-4. The complaint's abundant factual allegations pertaining to (1) staffing failures, (2) citations from NC DHSR, (3) results of NC DHSR investigations, and (4) negative reviews all support the plausibility of plaintiff's claim that Ms. Murphy did not receive the services she purchased. It would be premature at this stage, taking the allegations in the light most favorable to plaintiff, to dismiss the breach of contract claim as a matter of law.

Defendants' second argument, that plaintiff's breach of contract claim is contradictory, is without merit. The disclosure statement, which is incorporated into the residency agreement, promised to staff in accordance with North Carolina staffing requirements, which contain both needs-based and ratio standards.

11

Case 5:18-cv-00317-BO   Document 88   Filed 08/31/20   Page 11 of 13

### B. *Plaintiff has not stated a plausible UDTPA claim.*

Defendants move to dismiss plaintiff's UDTPA claim because, they argue, it impermissibly recasts her contract claim, involves matters already subject to an intricate regulatory scheme, and is barred by the learned profession exemption.

A breach of contract, even if intentional, does not support a UDTPA claim. *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998). North Carolina law does not allow plaintiffs to "multiply the damages for an ordinary breach of an agreement by re-characterizing the breach as a violation of the UDTPA." *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 224 (4th Cir. 2009). The allegations in plaintiff's complaint boil down to the following: defendants failed to provide what they promised in the residency agreement. The case against defendants lies in contract, not tort. Plaintiff's attempt to shoehorn "substantial aggravating circumstances" into the complaint is unavailing and consists largely of conclusory statements about fairness and defendants' motivations. "Given the contractual center of this dispute, [plaintiff's UDTPA claim is] out of place." *Broussard*, 155 F.3d at 347.

Because the Court determines that plaintiff's UDTPA claim merely re-characterizes her breach of contract claim and is properly subject to dismissal, the Court need not engage with defendants' remaining arguments.

### III. Steele Creek Residency Agreements

Defendants tack on a final argument to their motion—plaintiff lacks standing to bring a breach of contract claim and UDTPA claim in connection with the Steele Creek residency agreements. But plaintiff has not brought such claims, and so defendants' argument is groundless.

12

Case 5:18-cv-00317-BO   Document 88   Filed 08/31/20   Page 12 of 13

## CONCLUSION

For the foregoing reasons, defendants' motion [DE 81] is GRANTED IN PART and DENIED IN PART. Plaintiff's claims arising from Ms. Murphy's stays at Franklin Manor are stayed pending the outcome of arbitration. Plaintiff's UDTPA claim relating to Ms. Murphy's stay at Gabriel Manor is dismissed; the contract claim survives defendants' motion.

SO ORDERED, this __31__ day of August, 2020.

*Terrence Boyle*
TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE

13

Case 5:18-cv-00317-BO   Document 88   Filed 08/31/20   Page 13 of 13